UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ESTATE OF DJAMSHID "JIMMY" SHARMAHD,** *et al* | : : : | |
| *Plaintiffs,* | : : | |
| v. | : : | Case No. |
| **THE GOVERNMENT OF THE ISLAMIC REPUBLIC OF IRAN,** *incl. its ministries, agencies, and instrumentalities,* | : : : : : : | |
| *Defendant.* | : | |

## COMPLAINT

**COMES NOW**, Plaintiffs, and bring this action against the Islamic Republic of Iran pursuant to 28 U.S.C. § 1605A. Plaintiffs seek redress for Iran's wrongful acts, including the kidnapping, torture, unlawful detention, extrajudicial killing, and mutilation of Mr. Djamshid "Jimmy" Sharmahd, all of which were carried out by Iranian officials, agents, and instrumentalities acting under color of foreign state authority.

## PARTIES, VENUE, AND JURISDICTION

1. Djamshid "Jimmy" Sharmahd ("Mr. Sharmahd"), also known as "Jimmy," was a lawful resident of the United States, residing in Los Angeles, California. Jimmy was kidnapped, forcibly transported across international borders, unlawfully detained, tortured, and ultimately murdered by the Government of the Islamic Republic of Iran, acting through

1

its ministries, agencies, officials, and instrumentalities (collectively referred to herein as "Iran").

2. Plaintiff, the Estate of Djamshid "Jimmy" Sharmahd (the "Estate"), is the duly opened probate estate of Mr. Sharmahd, pending in *In re Estate of Djamshid Sharmahd*, Case No. 25STPB06719, in the Superior Court of California, County of Los Angeles. The Estate brings this action by and through its court-appointed executor, Gazelle Sharmahd, who is also named herein as a Plaintiff in her individual capacity.

3. Plaintiff, the Estate of Djamshid "Jimmy" Sharmahd, brings this action pursuant to 28 U.S.C. § 1605A(c) as the legal representative of Mr. Sharmahd. The Estate seeks recovery for the personal injuries, pain and suffering, torture, hostage-taking, and extrajudicial killing inflicted upon Mr. Sharmahd by the Islamic Republic of Iran and its officials, employees, agents, and instrumentalities acting within the scope of their authority.

4. Plaintiff, Mehrnoush Nassiri, is the surviving spouse of Djamshid "Jimmy" Sharmahd. She is a lawful United States permanent resident and otherwise sui juris. She brings this action in her individual capacity pursuant to 28 U.S.C. § 1605A(c) for all damages recoverable under federal law, including solatium, emotional distress, loss of consortium, punitive damages, and all other injuries proximately caused by Iran's kidnapping, torture, hostage-taking, and extrajudicial killing of her husband.

5. Plaintiff, Gazelle Sharmahd, is the daughter of Djamshid "Jimmy" Sharmahd. She is a United States citizen and otherwise sui juris. She is also the duly appointed personal representative and executor of the Estate of Djamshid "Jimmy" Sharmahd. In her individual capacity, she brings this action pursuant to 28 U.S.C. § 1605A(c) for all

damages recoverable under federal law, including solatium, emotional distress, loss of companionship, loss of guidance, punitive damages, and all other injuries proximately caused by Iran's kidnapping, torture, hostage-taking, and extrajudicial killing of her father.

6. Plaintiff, Schajan Sharmahd, is the son of Djamshid "Jimmy" Sharmahd. He is a lawful United States permanent resident and otherwise sui juris. In his individual capacity, he brings this action pursuant to 28 U.S.C. § 1605A(c) to recover all damages permitted under federal law, including solatium, emotional distress, loss of guidance, loss of companionship, punitive damages, and all other injuries proximately caused by Iran's kidnapping, torture, hostage-taking, and extrajudicial killing of his father.

7. Defendant, the Islamic Republic of Iran ("Iran"), is a foreign state within the meaning of 28 U.S.C. § 1603(a). Iran has been designated by the United States as a state sponsor of terrorism pursuant to § 6(j) of the Export Administration Act of 1979 and has remained so designated at all times relevant to this action. At all relevant times, Iran acted through, and is responsible for, its ministries, agencies, and instrumentalities, including the Ministry of Intelligence and Security ("MOIS"), the Islamic Revolutionary Guard Corps ("IRGC") and IRGC–Quds Force, and its judicial, intelligence, and prison officials who planned, authorized, directed, and carried out the kidnapping, torture, hostage-taking, extrajudicial killing, and desecration of Mr. Sharmahd. Iran is vicariously liable for the acts of its officials, employees, and agents pursuant to 28 U.S.C. § 1605A(c)(4).

8. Plaintiffs jointly plead and seek an award of punitive damages against the Islamic Republic of Iran pursuant to 28 U.S.C. § 1605A(c), based on Iran's willful, intentional, malicious, and egregious conduct, including the planned kidnapping, torture, hostage-

3

taking, extrajudicial killing, and desecration of Mr. Sharmahd. Punitive damages are warranted to punish Iran for its deliberate violations of international and United States law and to deter Iran and other state sponsors of terrorism from engaging in similar conduct in the future.

9. To the extent required by 28 U.S.C. § 1605A(a)(2)(A)(iii), Iran has been afforded a reasonable opportunity to arbitrate this claim. The acts giving rise to this action—including the hostage-taking of Mr. Sharmahd—were initiated and executed as part of a transnational operation beginning outside Iran, including in the United Arab Emirates. Accordingly, the arbitration condition set forth in § 1605A(a)(2)(A)(iii) is not implicated by Plaintiffs' primary jurisdictional theory.

10. In the alternative, to the extent the Court concludes that any "act" described in 28 U.S.C. § 1605A(a)(1) occurred within Iran for purposes of § 1605A(a)(2)(A)(iii), Plaintiffs allege that Iran has consistently and categorically refused to engage in arbitration or any other neutral dispute-resolution mechanism to address claims arising from the wrongful detention, torture, hostage-taking, and extrajudicial killing of United States nationals. Iran has rejected comparable claims, declined diplomatic or arbitral engagement in similar matters, and made clear that any request for arbitration in this case would have been futile.

11. Notwithstanding the foregoing, and without waiving any jurisdictional arguments or rights under the Foreign Sovereign Immunities Act, Plaintiffs remain ready, willing, and able to arbitrate this dispute. Iran may initiate arbitration at any time by contacting undersigned counsel to coordinate an arbitral forum and procedure, or by filing a notice of appearance and an unopposed motion requesting referral of this matter to arbitration.

12. Accordingly, all applicable statutory prerequisites, jurisdictional conditions, and preconditions to suit under 28 U.S.C. § 1605A have been satisfied, occurred, been excused, or been waived.

13. The acts and conduct complained of herein fall squarely within the terrorism exception to sovereign immunity set forth in 28 U.S.C. § 1605A and therefore are not protected by the Foreign Sovereign Immunities Act, as they involve acts of torture, hostage-taking, and extrajudicial killing committed by a designated state sponsor of terrorism.

14. At all relevant times, Plaintiff was lawfully present in the United States and owed permanent allegiance to the United States within the meaning of 8 U.S.C. § 1101(a)(22).

15. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1330(a) and personal jurisdiction pursuant to 28 U.S.C. § 1330(b), because this action falls within the terrorism exception to sovereign immunity set forth in 28 U.S.C. § 1605A and service will be effected in accordance with 28 U.S.C. § 1608.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(f)(4) because this action is brought against a foreign state and its agencies and instrumentalities.

## BACKGROUND

17. This action arises from the Islamic Republic of Iran's transnational kidnapping, prolonged torture, hostage-taking, and extrajudicial killing of Djamshid "Jimmy" Sharmahd, a lawful resident of the United States and outspoken critic of the Iranian regime. Acting through its intelligence services, security forces, prison officials, and judicial authorities, Iran abducted Jimmy abroad, forcibly disappeared him, subjected him to years of extreme physical and psychological abuse, denied him medical care and due

process, exploited his detention for political leverage against foreign governments, and ultimately executed him following a sham proceeding that lacked the judicial guarantees recognized as indispensable by civilized peoples. This action seeks accountability under federal law for Iran's coordinated campaign of state-sponsored violence and coercion.

18. Jimmy was born in Iran and migrated to Germany in the 1980s following the rise of the Islamic Republic. He studied electrical engineering and founded a computing business before relocating to the United States with his family in 2003. They settled in California, where Jimmy became a lawful resident and built a life centered on democratic values, free expression, and opposition to authoritarian rule. Long before his abduction, Jimmy was openly committed to promoting human rights and uncensored information about Iran, including reporting on activists, dissidents, and civil-society movements critical of the regime. established a company known as Sharmahd Computing. Through that company, he developed software and language-encoding tools, including an early Unicode-based program known as "UniPad," which was widely used for years by universities, telecommunications companies, and technology firms, including Nokia. Jimmy was known for writing efficient, low-bandwidth code using original HTML-based programming, which allowed his software to remain durable, secure, and functional over extended periods of time. Even after relocating to the United States, Jimmy continued to provide specialized programming services to overseas industrial clients, which shipped equipment to California for him to program and configure.

19. Using his expertise as a software engineer, Jimmy developed and managed websites and digital platforms that provided uncensored information and technical support to Iranian reform advocates and opposition voices. Among other projects, he provided technical and

6

web-publishing support for Tondar ("Thunder"), a monarchist opposition media platform advocating a secular and democratic Iran. Jimmy's role was limited to technical infrastructure, website design, and broadcasting support. Although the Islamic Republic of Iran has labeled Tondar a terrorist organization, that characterization has been consistently disputed by the group and its members, and Jimmy denied any involvement in violence or operational activity.

20. From Los Angeles, Jimmy became publicly associated with opposition broadcasting directed into Iran. He assisted in operating independent television and satellite radio programming that transmitted uncensored news and political commentary to Iranian audiences. This increased visibility from within the United States materially heightened Iranian authorities' interest in him and exposed him as a dissident operating under the protection of U.S. residency. Although Jimmy's contributions were intended to remain anonymous, a technical error publicly revealed his identity. This exposure allowed Iranian authorities to identify him personally, placing him at immediate risk and triggering a deliberate campaign by the Islamic Republic of Iran to monitor, target, and silence him for his journalistic and technical work in support of free expression and democratic reform.

21. In 2009, Jimmy was the target of an assassination attempt orchestrated by Iranian intelligence operatives operating on United States soil. Mohammad Reza Sadeghnia, an Iranian national residing in Michigan, was arrested near Los Angeles International Airport after attempting to hire a hitman to murder Jimmy for $32,000. Sadeghnia later pled guilty in Los Angeles Superior Court to charges arising from the plot but was permitted to travel abroad and absconded to Iran, becoming a fugitive from justice.

7

Contemporaneous reporting and a diplomatic cable from the U.S. Embassy in London—later published by WikiLeaks—further confirmed that Sadeghnia was acting on behalf of Iranian intelligence and had conducted surveillance on Iranian dissidents in the United Kingdom and United States, including Jimmy, demonstrating Iran's longstanding intent to silence him through violence. *See* Exhibit 1, December 3, 2010, CBS News Article, "Man Who Targeted Iran Critics Skips LA Court Date". *See also* Exhibit 2, January 21, 2010, Wikileaks Cable, "IRAN WATCHER CONTACT TARGETED BY IRANIAN REGIME".

22. In March 2020, Jimmy and his son, Schajan Sharmahd, departed the United States for what was intended to be a short business trip. Due to the onset of the COVID-19 pandemic and resulting international travel restrictions, they were forced to remain abroad longer than anticipated while attempting to arrange their return to the United States.

23. In July 2020, Jimmy and Schajan traveled to Dubai as part of their efforts to return to the United States. While in Dubai, an earlier return flight unexpectedly became available. Jimmy instructed Schajan to take the earlier flight, stating that he would remain behind and take the next available flight back to the United States. Schajan departed Dubai as directed. This separation marked the last time any member of Jimmy's family saw or heard from him.

24. Shortly after Schajan's departure, all communications from Jimmy abruptly ceased. Jimmy failed to board any subsequent return flight, did not contact his family, and did not access his accounts or otherwise indicate any voluntary change of plans. His sudden

disappearance was inconsistent with his stated intent to return to the United States and with his prior conduct.

25. It was subsequently revealed that Jimmy was abducted in Dubai by agents of the Islamic Republic of Iran and covertly removed from the country. He was forcibly trafficked across international borders and transferred into the custody of Iranian intelligence, where he was unlawfully detained and transported into Iran. On August 1, 2020, Iranian state television broadcast a video depicting Jimmy blindfolded and in captivity. That same day, Iran's Minister of Intelligence publicly announced that Jimmy had been seized in what he described as a "complex operation," thereby confirming Iran's responsibility for his abduction and detention.

26. Following Iran's public acknowledgment of Jimmy's abduction, Iranian authorities refused for months to disclose his whereabouts, condition, or legal status to his family. Jimmy was held incommunicado, denied access to counsel, consular officials, or independent observers, and forcibly disappeared within Iran's detention system. During this period, his family received no official notice of charges, no confirmation of his location, and no information regarding his health or treatment, causing extreme distress and uncertainty and placing Jimmy at constant risk of further abuse and death.

27. After approximately fourteen months of complete silence and enforced disappearance, Iranian authorities permitted the first limited proof of life. In late September 2021, Iran acknowledged that Jimmy remained alive in custody, but continued to withhold basic information regarding his location, legal status, and medical condition. Iranian officials thereafter allowed only two brief, tightly controlled phone calls—on March 23, 2022, and June 19, 2022—both conducted under the surveillance of security agents and subject to

9

censorship. During these calls, Jimmy conveyed that he had been held in prolonged solitary confinement since his abduction, denied human contact, forced to sleep on the floor of a small, windowless cell, and subjected to ongoing physical and psychological abuse.

28. Throughout his detention, Iranian authorities deliberately denied Jimmy necessary medical care, including treatment for his Parkinson's disease, despite knowing of his diagnosis and worsening condition. He was deprived of prescribed medication, denied access to physicians of his choosing, and refused independent medical evaluation. As a result, Jimmy experienced severe neurological deterioration, loss of motor control, chronic pain, and progressive physical decline. The intentional denial of medical care was used as an additional means of punishment, coercion, and psychological torture, further exacerbating his suffering and accelerating his physical breakdown while in Iran's custody.

29. In February 2022, after more than a year of enforced disappearance and incommunicado detention, Iranian authorities initiated criminal proceedings against Jimmy without notice to his family or any meaningful opportunity for defense. His case was assigned to Branch 15 of the Tehran Revolutionary Court and presided over by Judge Abolqasem Salavati, a judicial official notorious for imposing death sentences in politically motivated cases involving journalists, dissidents, and foreign nationals. The proceedings were conducted in secret, in a foreign language without translation, without access to counsel of choice, without the ability to review evidence, present witnesses, or challenge accusations, and without any of the procedural safeguards recognized as indispensable by civilized peoples.

30. The charges brought against Jimmy were based on fabricated allegations of "corruption on earth," a vague and sweeping offense routinely used by the Iranian regime to criminalize political dissent and justify executions. Iranian authorities relied on statements extracted from Jimmy through torture, prolonged isolation, and threats of death, and forced him to participate in scripted confessions that were broadcast on Iranian state media. These broadcasts were designed to legitimize his unlawful detention, inflame public sentiment, and increase the political leverage of his captivity, rather than to adjudicate any legitimate criminal conduct.

31. In February 2023, following the sham proceedings described above, the Revolutionary Court sentenced Jimmy to death. On April 26, 2023, the Iranian Supreme Court summarily upheld the sentence. At no stage did the courts remedy the absence of counsel of choice, the lack of meaningful notice, the denial of consular access, or the failure to afford the basic judicial guarantees recognized as indispensable by civilized peoples. The confirmation of the death sentence prompted immediate and widespread condemnation from Germany, the European Union, and international human rights organizations, all of which recognized the proceedings as fundamentally illegitimate and politically motivated.

32. Jimmy was denied medical treatment for his Parkinson's disease, confined for months in a small, windowless cell, and subjected to unrelenting physical and psychological torture designed to break his body and spirit. He was beaten, deprived of sleep, light, food, and water, and forced to endure prolonged solitary confinement under filthy and inhumane conditions. He was routinely threatened with death, forced to make false televised

"confessions," and denied access to counsel, consular officials, or his family. These acts caused unbearable physical pain, neurological deterioration, and psychological torment.

33. Following years of unlawful detention and abuse, Jimmy was executed by the Islamic Republic of Iran on October 28, 2024. His execution was carried out pursuant to a proceeding that lacked the judicial guarantees recognized as indispensable by civilized peoples, including the right to counsel of choice, a public and impartial tribunal, the opportunity to present evidence, and meaningful appellate review. The sentence was imposed following a politically motivated show trial before a tribunal controlled by the Iranian state and used as an instrument of repression. Jimmy's killing was therefore a deliberated killing not authorized by a regularly constituted court and constitutes an extrajudicial killing within the meaning of 28 U.S.C. § 1605A(h)(7). Following Jimmy's execution, Iranian authorities desecrated and mutilated his remains.

34. When his body was eventually repatriated, it was discovered that multiple organs—including his tongue, larynx, thyroid, and heart—had been removed prior to transfer. His brain was largely destroyed and disintegrated, with almost no identifiable structures remaining. The handling of Jimmy's body was intentional, unauthorized, and carried out under color of state authority, inflicting additional injury, indignity, and suffering upon him and profound emotional harm upon his surviving family. Jimmy's kidnapping, prolonged disappearance, and detention inflicted profound and ongoing harm on his family.

35. For years, his wife and children were left without knowledge of his whereabouts, health, or survival, receiving only sporadic and tightly controlled communications under Iranian surveillance. They were forced to watch coerced propaganda broadcasts in which Jimmy

appeared visibly deteriorated and under duress, while Iranian officials publicly threatened his execution. The secrecy surrounding his detention, the denial of consular access, and the absence of any lawful process subjected his family to constant uncertainty and fear. After his execution, the family learned that Jimmy's body had been mutilated and organs removed prior to repatriation, further compounding the trauma of his death and permanently altering their ability to grieve or obtain closure.

36. Iran abducted, detained, tortured, executed and desecrated Jimmy because of his journalism, political speech, and advocacy for democratic reform. Iran's actions were part of its deliberate state policy of targeting dissidents, journalists, and foreign nationals for purposes of retaliation, coercion, and political leverage. Iran identified Jimmy because of his journalism, political speech, and technological work supporting democratic reform. It abducted him in a transnational operation, held him incommunicado, subjected him to torture to extract false statements for propaganda, and used him as a bargaining asset in its dealings with the United States and Germany. His execution—carried out after proceedings that lacked the judicial guarantees recognized as indispensable by civilized peoples—and the subsequent desecration of his remains- reflect Iran's intentional use of violence to silence dissent and intimidate others, consistent with its longstanding pattern of state-sponsored hostage-taking, torture, and coercive repression.

37. Iran carried out the kidnapping, detention, torture, and execution of Jimmy for the explicit purpose of compelling foreign governments—including the United States and Germany—to take or refrain from specific governmental actions. Iran publicly portrayed him as a political captive, denied consular access, threatened execution, broadcast coerced statements, and used his continued detention as leverage in ongoing diplomatic

negotiations. These coercive actions were undertaken to obtain political, diplomatic, and economic concessions, and reflect Iran's deliberate state policy of using detained foreign nationals as instruments of pressure against other states.

## **STATUTORY FRAMEWORK AND CAUSE OF ACTION UNDER 28 U.S.C. § 1605A**

38. Congress enacted the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, to provide United States nationals and their families a civil remedy against foreign states designated as state sponsors of terrorism for acts of torture, extrajudicial killing, and hostage-taking committed under color of foreign law.

39. Section 1605A abrogates sovereign immunity and creates a federal cause of action where the Defendant is a designated state sponsor of terrorism, the claimant or victim is a national of the United States, and the injury or death was caused by an act of torture, extrajudicial killing, or hostage-taking, or by the provision of material support or resources for such acts.

40. At all times relevant to this action, the Islamic Republic of Iran was designated by the United States Department of State as a state sponsor of terrorism pursuant to § 6(j) of the Export Administration Act of 1979 and has remained continuously so designated since January 19, 1984.

41. Section 1605A(c) expressly authorizes a private cause of action for personal injury or death caused by acts described in § 1605A(a)(1), including torture, extrajudicial killing, and hostage-taking, committed by a foreign state or by an official, employee, or agent of that foreign state acting within the scope of their authority. In any such action, the statute authorizes recovery of economic damages, solatium, pain and suffering, and punitive

14

damages, and provides that the foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

42. The definitions of "torture," "hostage-taking," and "extrajudicial killing" incorporated into § 1605A derive from the Torture Victim Protection Act and binding international conventions, and encompass prolonged incommunicado detention, severe physical and psychological abuse, coercion of third parties through threats or violence, denial of fundamental judicial guarantees, and executions carried out without due process.

43. As alleged in detail above, Iran's conduct toward Djamshid "Jimmy" Sharmahd—including his transnational abduction, prolonged enforced disappearance, incommunicado detention, intentional infliction of severe physical and psychological pain, denial of necessary medical care, coercive interrogation and propaganda, use of his continued detention and threatened execution to compel foreign governments to take or refrain from governmental action, execution following proceedings that lacked the judicial guarantees recognized as indispensable by civilized peoples, and the post-mortem mutilation and desecration of his body—constitutes acts of torture, hostage-taking, and extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

44. These acts were carried out by officials, employees, and agents of the Islamic Republic of Iran acting under color of foreign law and within the scope of their authority, rendering Iran directly and vicariously liable under § 1605A(c).

45. Iran's conduct caused severe personal injury and death to Jimmy and resulted in profound economic, emotional, and dignitary harms to his Estate and surviving family members. Accordingly, Iran is subject to civil liability under 28 U.S.C. § 1605A for all damages

authorized by Congress, including economic damages, pain and suffering, solatium, and punitive damages.

## COUNT I – PERSONAL AND ECONOMIC INJURIES CAUSED BY TORTURE, HOSTAGE TAKING, AND EXTRAJUDICIAL KILLING UNDER 28 U.S.C. § 1605A(c)
### (Estate of Plaintiff)

46. Plaintiff, the Estate of Djamshid "Jimmy" Sharmahd, realleges and incorporates by reference paragraphs 1-45 as if fully set forth herein.

47. At all relevant times, Defendant Islamic Republic of Iran was designated as a state sponsor of terrorism and acted through its officials, employees, agents, ministries, and instrumentalities, including its intelligence services, prison authorities, interrogators, and judicial officials, all acting under color of foreign law and within the scope of their authority.

48. While in Iran's custody and control, Jimmy was intentionally subjected to acts of torture, hostage-taking, and extrajudicial killing within the meaning of 28 U.S.C. § 1605A. These acts included his transnational abduction, prolonged enforced disappearance, incommunicado detention, severe physical and psychological abuse, denial of medical care, threats of death, coercive interrogations and propaganda, unlawful detention used to compel foreign governments, and execution following proceedings that lacked the judicial guarantees recognized as indispensable by civilized peoples.

49. Iran's conduct was intentional, malicious, and undertaken as a matter of official state policy, rendering Iran directly and vicariously liable pursuant to 28 U.S.C. § 1605A(c)(4).

50. As a direct and proximate result of Iran's conduct, Jimmy suffered extreme physical pain and suffering, psychological terror, mental anguish, humiliation, neurological deterioration, total loss of liberty, and ultimately death. His suffering continued without interruption from the moment of his abduction through his execution and was compounded by the post-mortem mutilation and desecration of his body.

51. The Estate has suffered compensable survival and wrongful-death damages, including personal injury damages, pain and suffering, mental anguish, and loss of life, all of which are recoverable under 28 U.S.C. § 1605A(c) and (d).

52. As a further direct and proximate result of Iran's acts, the Estate has suffered substantial economic damages, including the loss of Jimmy's past and future earning capacity, lost wages and income, loss of financial support, and the economic value of services, contributions, and benefits he would have provided but for his unlawful detention, torture, and death, together with all other reasonably foreseeable economic losses recoverable under 28 U.S.C. § 1605A(c) and (d).

53. The Estate further seeks punitive damages pursuant to 28 U.S.C. § 1605A(c), based on Iran's willful, wanton, and egregious conduct, to punish Iran for its deliberate use of torture, hostage-taking, and extrajudicial killing as instruments of state policy and to deter similar conduct in the future.

## COUNT II, III, IV – SOLATIUM, EMOTIONAL DISTRESS, AND RELATED DAMAGES CAUSED BY TORTURE, HOSTAGE TAKING, AND EXTRAJUDICIAL KILLING UNDER 28 U.S.C. § 1605A(c)
### (Individual Plaintiffs)

54. Plaintiffs Mehrnoush Nassiri, Gazelle Sharmahd, and Schajan Sharmahd reallege and incorporate by reference paragraphs 1-45 as if fully set forth herein.

55. As a direct and proximate result of the Islamic Republic of Iran's acts of kidnapping, enforced disappearance, prolonged torture, hostage-taking, extrajudicial killing, and post-mortem desecration of Jimmy Sharmahd, the individual Plaintiffs—his surviving spouse and children—have suffered severe and enduring emotional, psychological, and dignitary harm. For years, they were deprived of any knowledge of Jimmy's whereabouts, condition, or survival; subjected to terror and uncertainty caused by Iran's secrecy, threats, and propaganda; and forced to witness his physical and psychological deterioration through coerced broadcasts and limited, monitored communications. The prolonged anticipation of his execution, followed by confirmation of his death and mutilation, inflicted profound grief, trauma, loss of companionship, loss of love, loss of guidance, and loss of society.

56. Iran's conduct was intentional, malicious, and calculated to maximize suffering not only to Jimmy but also to his family, by exploiting their emotional bonds as a means of coercion and political leverage. The harms suffered by the individual Plaintiffs constitute solatium, emotional distress, and related damages expressly recoverable under 28 U.S.C. § 1605A(c).

57. As a result, the individual Plaintiffs are entitled to recover solatium damages and all other non-economic damages authorized by 28 U.S.C. § 1605A(c), together with punitive damages to punish and deter Iran's egregious and unlawful conduct.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant, the Islamic Republic of Iran, and award the following relief:

a) That judgment be entered in favor of Plaintiff, the Estate of Djamshid "Jimmy" Sharmahd, and against Defendant for all damages recoverable under 28 U.S.C. § 1605A(c) and (d), including compensatory damages for personal injury and death, past and future lost earnings and earning capacity, economic loss, pain and suffering, emotional distress, mental anguish, and all other consequential and reasonably foreseeable damages caused by Iran's acts of torture, hostage-taking, and extrajudicial killing.

b) That judgment be entered in favor of the individual Plaintiffs, Mehrnoush Nassiri, Gazelle Sharmahd, and Schajan Sharmahd, and against Defendant for solatium damages and all other non-economic damages authorized under 28 U.S.C. § 1605A(c), including compensation for emotional distress, grief, mental anguish, loss of companionship, loss of society, loss of guidance, and the severe psychological harm resulting from Iran's conduct.

c) That punitive damages be awarded against Defendant pursuant to 28 U.S.C. § 1605A(c) in an amount sufficient to punish Iran for its intentional, malicious, and egregious conduct and to deter Iran and other state sponsors of terrorism from engaging in similar acts in the future.

d) That Plaintiffs be awarded all additional damages authorized by 28 U.S.C. § 1605A(d), including all reasonably foreseeable property loss, whether insured or uninsured, third-

party liability, and loss claims under life and property insurance policies arising from the same acts forming the basis of this action.

e) That Plaintiffs be awarded pre-judgment interest, post-judgment interest, costs of suit, attorney's fees, and such other relief as the Court deems just and proper.

**DONE AND FILED** in the United States District Court for the District of Columbia this 5th day of January, 2026.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

| | |
|---|---|
| **BARKET LAWYERS**<br>Concorde Building - 7th Floor<br>66 W. Flagler Street<br>Miami, FL, 33130<br>Tele: (305) 373-6711<br>Dylan@barketlawyers.com<br>Pleadings@barketlawyers.com<br><br>/s/Dylan G. Barket, Esq.<br>Florida Bar Number: 1026381<br>D.C. District ID: FL00128 | **Poblete Tamargo LLP**<br>600 Cameron Street, Suite 411<br>Alexandria, Virginia 22314<br>703.566.3037<br>jpoblete@pobletetamargo.com<br>mtamargo@pobletetamargo.com<br><br>/s/ Jason Ian Poblete, Esq.<br>D.C. District ID: 50414<br><br>/s/ Mauricio Tamargo, Esq.<br>D.C. District ID: 469839 |